Filed 10/29/13  In re L.P. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re L.P. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>J.P. et al.,<br><br>        Defendants and Appellants. | E057864<br><br>(Super.Ct.No. J246227-29)<br><br>O P I N I O N |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey, Judge.  Reversed with directions.

Matthew I. Thue, under appointment by the Court of Appeal, for Defendant and Appellant J.P.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant R.J.

1

Jean-Rene Basle, County Counsel, and Dawn M. Messer, Deputy County Counsel, for Plaintiff and Respondent.

## I. INTRODUCTION

On this appeal from a juvenile court dispositional order, defendants and appellants, J.P. (Mother) and R.J. (Father), raise three claims of error: (1) their history of methamphetamine use is insufficient to support the court's jurisdictional findings that the children were at risk of abuse or neglect (Welf. & Inst. Code, § 300, subd. (b));[1] (2) the court abused its discretion in ordering the children removed from parental custody at disposition (Welf. & Inst. Code, § 361, subd. (c)(1)); and (3) inadequate notice of the proceedings was given under the Indian Child Welfare Act (ICWA) (25 U.S.C.A. § 1901 et seq.) and related California law (Welf. & Inst. Code, §§ 224.2, 224.3).

We reject the parents' first and second claims of error, but plaintiff and respondent, San Bernardino County Children and Family Services (CFS), concedes its ICWA notice lacked known information concerning paternal relatives. Father is the only parent who may have Indian heritage. The ICWA notice did not include information concerning any paternal relatives other than Father even though names of the paternal grandparents were known or readily available to CFS when the notice was given. It also appears CFS could have obtained additional paternal relative information had it made

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

appropriate inquiries. We therefore conditionally reverse the dispositional order and remand the matter for further proceedings described below.

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

In September 2012, Mother and Father were an unmarried, cohabitating couple with three children: A.P., a boy age 8; I.P., a boy age 18 months; and L.P., a newborn girl. Father had five older children. Father was born in 1971; Mother in 1982. Both parents had numerous drug-related convictions and a lengthy history of substance abuse.

The family came to the attention of CFS when Mother and L.P. tested positive for methamphetamine at the hospital when L.P. was born in September 2012. L.P. was transferred to the neonatal intensive care unit due to respiratory problems and withdrawals. When I.P. was born 18 months earlier in March 2011, he, too, tested positive for methamphetamine. In April 2011, the parents were offered voluntary maintenance services, including referrals to outpatient treatment centers and parenting classes, but they did not use the services.

The parents were interviewed at their home on September 27, 2012. The home was described as "clean and appropriate," and A.P. and I.P. appeared "healthy, clean and appropriate." Mother was well groomed and the parents were aware of the reason for the child welfare referral and interview. Mother admitted using methamphetamine while pregnant with I.P. and L.P., including the day before L.P. was born. She said she thought

---

[2] Here we focus on the facts underlying the jurisdictional findings and order removing the children from parental custody. The facts concerning the ICWA inquiry and notice issue are set forth below in our discussion of that issue.

3

she was overdue; she wanted to induce labor and "be done with" the pregnancy. She had been using methamphetamine since middle school. She did not initially seek prenatal care because she was ambivalent about the pregnancy.

For his part, Father denied he was "out of it" or "stumbling" at the hospital when L.P. was born, as had been reported, and he also denied Mother's claim that he was dependent on pain medication. He said he was using pain medication following his recent rotator cuff surgery after falling off a skateboard. Both parents failed to drug test on September 28, 2012.

On October 2, the parents participated in a team decision meeting (TDM) with the social worker. Mother appeared under the influence and was "extremely agitated, emotional, and unable to understand the concerns of [CFS]." She was "unwilling to be open and honest about her substance abuse." However, Mother admitted she failed to complete a court-ordered Proposition 36 treatment program following a November 2011 conviction for being under the influence of a controlled substance. Father admitted having a history of methamphetamine use and said he last used methamphetamine two days before the TDM. Still, at the TDM he was "more able [than Mother] to participate appropriately in the proceedings, addressing the concerns for the safety of the children." The issue of the parents' active drug use and its negative impact on their ability to care for the children and ensure their safety was discussed. Immediately following the TDM, the children were removed from parental custody and placed in foster care.

4

Father's criminal history included a 2005 conviction for inflicting corporal injury on a spouse/cohabitant; 2006, 2007, and 2012 convictions for using, possessing, or being under the influence of a controlled substance; and convictions for burglary and possessing a tool with felonious intent in 2008 and 2009. Mother had four drug-related convictions, including her November 2011 conviction.

At the detention hearing on October 5, the children were ordered detained outside the parents' custody, and the parents were allowed supervised visitation. Both parents were ordered to drug test on October 5, and both tested positive for methamphetamine on that date.

Additional details concerning the parents' substance abuse history came to light in an October 17 interview. Mother had been using drugs for 17 years; methamphetamine was her drug of choice; and one year was the longest time she had been sober since age 13. In addition to using methamphetamine to induce labor with L.P., she used the drug in July 2012, knowing she was pregnant with L.P. Father admitted to a history of drug use spanning "a few years." He said he and Mother would use methamphetamine in the bedroom while the kids were outside; they would "take turns using and watching the kids."

Father had five other children, ages 12 to 22, with three other mothers, and had no contact with any of his older children. He was receiving state disability payments because he was electrocuted when he was with a friend who was trying to steal a circuit breaker. He admitted he was under the influence of methamphetamine at the time of his

5

July 2012 arrest for being under the influence but he denied responsibility for his other criminal convictions. He said he "took the blame for someone else" for his 2006 and 2007 drug-related convictions and his 2009 burglary conviction.

On October 17, both parents enrolled in an outpatient treatment program. They were refusing to participant in inpatient treatment, which CFS was strongly recommending, for Mother in particular. In court on October 25, the parents denied they were using drugs. Both parents failed to test as ordered on October 25. On November 16, Mother tested positive for amphetamines.

In early November 2012, I.P. required emergency surgery. He had a diaper rash before being placed in foster care, the rash worsened, and a large cavity in his buttock with "copious amounts of purulent material" had to be drained. He was diagnosed with cellulitis and sepsis. I.P. also had bruises on his cheeks, under his arms, and in other places on his body.

Because of the possible physical abuse of I.P. in the children's first foster home, the children were placed in a second foster home. I.P. had little to no language development at age 19 months. The second foster parents reported he was "extremely active" and had a propensity to scream "loudly and frequently." The foster parents requested his removal. I.P. and A.P. were then placed in a third foster home, while L.P. remained in the second foster home.

A.P. was attending third grade when he was removed from parental custody on October 2. As a result of his placement changes, he missed one to two months of school.

6

Contested jurisdictional and dispositional hearings were held on November 20 and 21. Mother testified at the jurisdictional hearing, claiming she last used methamphetamine in July 2012 and her prior drug use had been "[y]ears ago." All of her positive drug tests since July 2012 were "false positives" and were associated with an antismoking drug she was taking. She was not telling the truth when she told the social worker she used methamphetamine to induce labor when L.P. was born, and she also lied when she admitted I.P. tested positive for methamphetamine at his birth 18 months earlier. She only told the social worker these things because she wanted L.P. returned home.

Father testified at the dispositional hearing. He admitted using methamphetamine in July 2012 and on October 5, and also admitted he failed to drug test as ordered on October 25. He acknowledged he had a substance abuse problem but denied it affected his ability to parent the children. He was "active" with the children and played with them; he did not abuse them; and they were better off in his care than in foster care. He did not believe Mother was still using drugs. Both parents asked the court to return the children to their care pursuant to a family maintenance plan.

Following the jurisdictional hearing, the court found: (1) each parent had a history of methamphetamine use which continued to the present and impaired their ability to parent the children; (2) each parent had a criminal history which impaired their ability to

7

parent the children; and (3) Mother had a history of anxiety and depression that affected her ability to parent.[3] (§ 300, subds. (b), (j).)

The court told the parents: "It is apparent and obvious to the Court that both of you are struggling with addiction. I don't believe either of you and your testimony that you're not using methamphetamine. The absence of testing from both of you tells me that you're still using, and you're not handling your addictions very well."

At disposition, the court ordered the children removed from parental custody (§ 361, subd. (c)(1)) and ordered reunification services and supervised visitation for both parents. Less than two weeks later, on November 30, 2012, the children were placed with their paternal grandmother and paternal stepgrandfather. The parents appeal the dispositional order. (§ 395.)

## III. DISCUSSION

A. *Substantial Evidence Supports the Court's Jurisdictional Findings*

The parents claim insufficient evidence supports the court's jurisdictional findings as to all of the children under section 300, subdivision (b). They argue there is no evidence linking their histories of substance abuse, their criminal histories, or Mother's history of anxiety and depression to a substantial risk of harm to any of the children. We disagree.

---

[3] Pursuant to the parties' stipulation, the court struck an allegation that Mother and L.P. tested positive for methamphetamine at L.P.'s birth, because the report from the hospital showed the drug test results were negative. The court found I.P. tested positive for methamphetamine at his birth in March 2011, however.

At the jurisdictional hearing, the court considers whether the child is described in one or more subdivisions of section 300 and thus whether the child is within the court's dependency jurisdiction. (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.) "'Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial* risk of *serious physical* harm or illness.' [Citation.]" (*In re A.S.* (2011) 202 Cal.App.4th 237, 244.) The agency must make this showing by a preponderance of the evidence. (§ 355, subd. (a); *In re A.S., supra, at* p. 244.) "'The basic question under section 300 is whether the circumstances *at the time of the hearing* subject the minor to the defined risk of harm.'" (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022, italics added.)

"On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings." (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) Substantial evidence means "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value." (*Ibid.*) The appellant has the burden of showing that there is no evidence of a sufficiently substantial nature to support the court's findings. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

"[W]e look to the entire record to determine whether there is substantial evidence to support the findings of the juvenile court. We do not pass judgment on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Rather, we draw all reasonable inferences in support of the findings,

9

view the record in the light most favorable to the juvenile court's order, and affirm the order even if there is other evidence that would support a contrary finding." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 915-916.)

The parents argue the court was presented with no evidence linking the parents' substance abuse, criminal histories, or Mother's history of anxiety and depression to a substantial risk of serious physical harm to the children. (§ 300, subd. (b).) They emphasize they maintained a clean and appropriate home for the children; they cared for them in a way that left them stable, healthy, and clean; and, unlike CFS or the first foster parents, they ensured A.P. was enrolled in school.

The parents' argument denies the seriousness of the parents' long-standing and unresolved substance abuse problems and the substantial risk of serious physical harm those problems posed to the children at the time of the jurisdictional hearing. The court found and substantial evidence shows that Mother used methamphetamine during her pregnancies with L.P. and I.P. At age 19 months, I.P. had language delays and behavior problems associated with his *in utero* drug exposure. The parents continued to use methamphetamine even after L.P. suffered respiratory problems and withdrawals at birth and had to be transferred to a neonatal intensive care unit. Father admitted the parents would use methamphetamine in their bedroom and take turns watching the children while actively high on methamphetamine. The parents saw nothing wrong with this behavior or the substantial risk of physical harm it posed to the children.

10

Without question, the parents' ongoing methamphetamine use at the time of the jurisdictional hearing placed the children at a substantial risk of serious physical harm. (§ 300, subd. (b).) There was a substantial risk that any of the children could gain access to the parents' methamphetamine in the home where the parents were using it. There was also a substantial risk that any of the children could be physically harmed *in and outside the home* by any number of means while under the care of the parents while they were actively high on methamphetamine. CFS thus met its "'burden of showing specifically how the minors have been or will be harmed . . . .'" (*In re James R.* (2009) 176 Cal.App.4th 129, 136.) The evidence also showed that the parents' criminal histories and Mother's history of anxiety and depression resulted, in part, from the parents' chronic methamphetamine use. As such, these problems were part and parcel of and exacerbated the substantial risk of serious physical harm to the children posed by the parents' ongoing methamphetamine use.

Mother argues her "decision to use drugs while pregnant was an unquestionably neglectful act that had put both [I.P. and L.P] at risk of serious physical harm in the past. But the risks associated with in utero drug exposure disappeared at birth. . . ." Not so. The parents were currently, not formerly, addicted to methamphetamine. They were using methamphetamine in the home where the children could access it, and they could not care for the children, high on methamphetamine, without exposing the children to a substantial risk of serious physical harm in and outside the home.

11

As the parents point out, substance abuse, "standing alone" and "without more," is insufficient to support section 300, subdivision (b) findings. (*In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003; *In re Drake M.* (2012) 211 Cal.App.4th 754, 764; *In re Alexis E.* (2009) 171 Cal.App.4th 438, 453; *In re David M.* (2005) 134 Cal.App.4th 822, 825-832; see also *In re James R., supra,* 176 Cal.App.4th at pp. 135-136 [parents' history of mental instability "without more" was insufficient to support jurisdictional findings].) But as discussed, substantial evidence shows the children were at a substantial risk of serious physical harm due to the parents' unresolved substance abuse problems, their criminal histories, and Mother's history of anxiety and depression.

B. *There Were No Reasonable Alternatives to Removal*

Mother claims insufficient evidence supports the order removing the children from parental custody at disposition. (§ 361, subd. (c)(1).) She argues there were alternatives to addressing the children's safety without removing them from the parents' home—such as conditioning the home placement order on the parents' compliance with rehabilitative services.

Before the court may order a child physically removed from his or her parent, it must find by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the

minor's parent's . . . custody." (§ 361, subd. (c)(1); *In re Hailey T.* (2012) 212 Cal.App.4th 139, 145-146.)

Removal "is a last resort, to be considered only when the child would be in danger if allowed to reside with the parent." (*In re Henry V.* (2004) 119 Cal.App.4th 522, 525.) Jurisdictional findings are prima facie evidence that the child cannot safely remain in the parental home. (§ 361, subd. (c)(1).) """The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.""" (*In re A.S., supra,* 202 Cal.App.4th at p. 247.) We review a dispositional order removing a child from parental custody for substantial evidence. (*In re R.V.* (2012) 208 Cal.App.4th 837, 849.)

Here, substantial evidence shows the children were at risk of harm in the parents' custody and, in order to ensure their safety, there were no reasonable alternatives to removing them from the parents' home. (§ 361, subd. (d).) The parents' addictions to methamphetamine were chronic and ongoing, and they had a history of resisting treatment for their methamphetamine addictions. Both failed to take advantage of substance abuse referrals in March 2011, after I.P. was born exposed to methamphetamine. Mother failed to complete a Proposition 36 program following her November 2011 arrest for being under the influence of a controlled substance. Neither parent recognized how their addictions adversely affected the children's safety and well being. In these circumstances, there were no reasonable alternatives to removal. (§ 361, subd. (c)(1).)

13

Our conclusion there were no reasonable alternatives to removal is not intended to minimize the job the parents did in keeping the children clean, fed, and safe from harm *despite* the parents' chronic and ongoing methamphetamine addictions. We are hopeful the parents have seen fit to take advantage of the reunification services they were offered at disposition and have by this time gained insight into the serious risk of harm their methamphetamine addictions have posed to the children. If the parents overcome their long-standing addictions, the children can safely be returned to their care.

C. *Conditional Reversal and Remand is Required Because CFS Failed to Comply With the Inquiry and Notice Requirements of the ICWA and Related California Law*

Lastly, the parents claim, and CFS agrees, that CFS sent ICWA notices for all three children that failed to contain known or reasonably available information concerning paternal relatives with possible Indian ancestry. We agree and conditionally reverse the dispositional order with directions as set forth below. (*In re Francisco W.* (2006) 139 Cal.App.4th 695, 704-705, 711.)

1. The Inquiry and Notice Requirements

The ICWA was enacted "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families . . . ." (25 U.S.C.A. § 1902.) "The ICWA presumes it is in the best interests of the child to retain tribal ties and cultural heritage and in the interest of the tribe to preserve its future generations . . . ." (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 469.) To this end, section 1911 of

14

the ICWA allows a tribe to intervene in state court dependency proceedings. (25 U.S.C.A. § 1911(c).)

Notice of the proceedings is required to be sent whenever it is known or there is reason to know that an Indian child is involved. (25 U.S.C.A. § 1912(a); Welf. & Inst. Code, § 224.2, subd. (a); see *In re Desiree F., supra,* 83 Cal.App.4th at p. 469.) Notice serves a twofold purpose: "(1) it enables the tribe to investigate and determine whether the minor is an Indian child; and (2) it advises the tribe of the pending proceedings and its right to intervene or assume tribal jurisdiction." (*In re Desiree F., supra,* at p. 470.)

If the tribe is unknown, notice must be given to the Bureau of Indian Affairs. (25 U.S.C.A. § 1912(a); *In re Desiree F., supra,* 83 Cal.App.4th at p. 469; *In re Daniel M.* (2003) 110 Cal.App.4th 703, 707.) No foster care placement or termination of parental rights proceeding may be held until at least 10 days after the tribe, or the BIA where the tribe is unknown, receives notice. (25 U.S.C.A. § 1912(a); *In re A.B.* (2008) 164 Cal.App.4th 832, 838.)

In addition to the child's name and date and place of birth, if known, the notice is required to include the "name of the Indian tribe in which the child is a member or may be eligible for membership, if known." (§ 224.2, subd. (a)(5)(B).) The notice is also required to contain "[a]ll names known of the Indian child's biological parents, grandparents, and great-grandparents, . . . as well as their current and former addresses, birthdates, places of birth and death, tribal enrollment numbers, and any other identifying information, if known." (§ 224.2, subd. (a)(5)(C).)

15

Juvenile courts and child protective agencies have "'an affirmative and continuing duty'" to inquire whether a dependent child is or may be an Indian child. (*In re H.B.* (2008) 161 Cal.App.4th 115, 121; § 224.3; Cal. Rules of Court, rule 5.481.) As soon as practicable, the social worker is required to interview the child's parents, extended family members, the Indian custodian, if any, and any other person who can reasonably be expected to have information concerning the child's membership status or eligibility. (§ 224.3, subd. (c); *In re Shane G.* (2008) 166 Cal.App.4th 1532, 1539; Cal. Rules of Court, rule 5.481(a)(4).) "Notice is meaningless if no information or insufficient information is presented to the tribe." (*In re S.M.* (2004) 118 Cal.App.4th 1108, 1116, fn. omitted.)

2. CFS's Failure to Comply

At the time of the detention hearing on October 5, 2012, Father signed and filed a Parental Notification of Indian Status (form ICWA-020), indicating he "may have" Indian ancestry.[4] On the form, Father did not identify any possible tribes or provide any information concerning his possible Indian ancestry. When the court asked Father whether he may have Indian ancestry, Father replied: "We weren't sure. I don't think so." He said he thought his mother's great-grandmother—the children's great, great, great-grandmother—may have had Indian ancestry.

The paternal grandmother was present in court and, when asked, said the Indian ancestry was "[o]n your dad's side," referring to the paternal grandfather. The paternal

---

[4] Mother filed the same form indicating she *did not have* Indian ancestry.

16

grandfather was deceased, but Father said he could ask the paternal grandfather's sister for more information. At the time of the detention hearing, CFS was assessing the paternal grandmother's home for placement.

On November 5, 2012, CFS sent ICWA notices to the BIA for each of the three children. The notices contained information concerning the parents, but the boxes for inserting the names, current and former addresses, birth dates and places, tribes, and other information concerning paternal relatives other than Father were marked "unknown" or "no information available."

But, as CFS concedes, relevant information concerning other paternal relatives was either known or available to CFS when the notices were sent.[5] The dispositional order must therefore be conditionally reversed and the matter remanded to the juvenile court with directions to order CFS to comply with the inquiry and notice provisions of the ICWA and related California law. (§§ 224.2, 224.3.)

## IV. DISPOSITION

The dispositional order is conditionally reversed and a limited remand is ordered as follows. Upon remand, the court shall direct CFS to make further inquiries regarding the children's Indian ancestry pursuant to section 224.3 and send ICWA notices to all relevant tribes in accordance with the ICWA and California law. CFS shall thereafter file

---

[5] The BIA responded to the ICWA notice by letter, stating "[t]he family provided insufficient information substantiating any federally recognized tribe. The family must provide a history back to the year 1900 with names, birth dates, and/or birthplaces of ancestors to help in establishing a biological link with the original ancestral tribal member(s)."

17

certified mail, return receipts, for the ICWA notices, together with any responses received. If no responses are received, CFS shall so inform the court. The court shall determine whether the ICWA notices and the duty of inquiry requirements have been satisfied and whether the children are Indian children. If the court finds the children are not Indian children, it shall reinstate the dispositional order. If the court finds the children are Indian children, it shall conduct all further proceedings in compliance with the ICWA and related California law.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
J.

We concur:

RAMIREZ
P. J.

HOLLENHORST
J.